AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

**FILED**

May 20 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            s/ VeronicaCota            DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Black Apple iPhone Model: Unknown Seized as FP& F: 2024255400014301 Item: 005 | ) ) ) |

Case No.   24MJ8429

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Transportation of Illegal Aliens |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Fernando Quiroz incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under* 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Border Patrol Agent Fernando Quiroz
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means).*

Date: ___05/20/2024___

*Judge's signature*

City and state: El Centro, California

HON. LUPE RODRIGUEZ JR., U.S. MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A-2
### PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-2:**          Black Apple iPhone
               Model: Unknown
               Seized as FP& F: 2024255400014301 Item: 005
               Seized from Jose IXTLAHUACA-Conde
               **(Target Device #2)**



The **Target Devices** are currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the mobile telephones described in Attachments A-1 to A-3 include the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of April 11, 2024, up to and including May 11, 2024, and is limited to the following:

a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, and/or phone numbers that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e. tending to identify the user of, or persons with control over or access to, the Target Device;

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of 8 U.S.C. § 1324.

## AFFIDAVIT

I, Fernando Quiroz, United States Border Patrol Agent, having been duly sworn, depose and state as follows:

### INTRODUCTION

1.    I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

**A-1:**        Dark Blue Apple iPhone
            Model: Unknown
            Seized as FP& F: 2024255400014301 Item: 002
            Seized from Mark Anthony ROJAS-Alvarez
            **(Target Device #1)**

**A-2:**        Black Apple iPhone
            Model: Unknown
            Seized as FP& F: 2024255400014301 Item: 005
            Seized from Jose IXTLAHUACA-Conde
            **(Target Device #2)**

**A-3:**        Light Blue VIVO Cellphone
            Model: Unknown
            Seized as FP& F: 2024255400014301 Item: 007
            Seized from Francisco SOLIS-Vasquez
            **(Target Device #3)**

as further described in Attachments A-1 to A-3, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.    The requested warrant relates to the investigation and prosecution of Mark Anthony ROJAS-Alvarez (ROJAS) for transportation of illegal aliens Jose IXTLAHUACA-Conde (IXTLAHUACA) and Francisco SOLIS-Vazquez (SOLIS) (collectively, the "Material Witnesses") in violation of Title 8 U.S.C. § 1324 within the Southern District of California. The Target Devices were seized from ROJAS and the Material Witnesses on or about May 10, 2024, incident to the arrest of ROJAS and the Material Witnesses. The Target Devices are currently in the possession of the Department

of Homeland Security, El Centro Border Patrol Sector Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I, or others, have learned during the course of this investigation. The information contained in this Affidavit is based upon my personal observations and knowledge, my review of various official reports, and upon conversations with other Border Patrol Agents. Dates and times are approximate.

## EXPERIENCE AND TRAINING

4. I am a United States Border Patrol Agent with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal BPA with the USBP since June 4, 2007, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The Border Patrol Academy curriculum covers specialized training in the Immigration and Naturalization Act (INA), training in Titles 8,18, 19, 21 and 31 of the United States Code, criminal law, and statutory authority.

5. I am currently assigned to the El Centro Sector Prosecutions Unit. The El Centro Sector Prosecutions Unit is tasked with the responsibility of investigating and prosecuting alien smuggling organizations that utilize the Southern and Central Districts of California as an operational corridor. In the course of my duties as a Border Patrol Agent, I investigate and prepare cases for prosecution against persons involved in the inducement of the illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; and the transportation and harboring of undocumented aliens within the United States.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of

California.  I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities.  Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

7.     The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens.  For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors.  Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing.

8.     Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text

messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

10.   On May 10, 2024, the Calexico Border Patrol Station's Anti-Smuggling Unit (ASU) was conducting surveillance in the East Desert of the Calexico Border Patrol Station's Area of Responsibility (AOR) approximately 32 miles east of the Calexico, California West Port of Entry. This area consists of desert terrain, the All-American Canal, and Interstate 8 (I-8). Aliens frequently use this area to illegally enter the United States due to the remoteness of the area and the ease of access to 1-8.

11.   At approximately 4:09 p.m., BPA Chrisley, who was assigned to Remote Video Surveillance System (RVSS), observed one suspected illegal alien running north towards Frontage Road. Frontage Road is approximately one and a half miles north of the border fence. BPA Chrisley relayed this information to the other ASU members in the field.

12.   Around that time, National Guard members assigned to the Mobile Video Surveillance System located at Swingles Hill, relayed over the service radio the location of another suspected illegal alien. This second suspected illegal alien was located southeast of the suspected illegal alien located south of Frontage Road. Both suspected illegal aliens met up at a bush south of Frontage Road and hid for approximately 20 minutes. At that time, BPA Chrisley handed over RVSS duties to BPA R. Bautista to respond to the traffic. BP A Bautista assumed video surveillance responsibilities and began to relay all information to ASU members via service radio.

13.   At approximately 4:13 p.m., BPA Durazo was located at the Buttercup Ranger Station and observed a white sedan, later identified as a 2012 Mercedes E350 bearing California license plates, exit 1-8 at Grey's Well Road. After exiting 1-8, BPA Durazo observed the Mercedes travel westbound on Frontage Road. Approximately two minutes later, BPA Durazo observed the same Mercedes travel back eastbound on Frontage Road, north on Grey's Well overpass and merge onto 1-8 westbound. BPA Durazo informed other ASU members in the area of the Mercedes' travel pattern.

14.   At approximately 4:35 p.m., BPA Chrisley observed a white sedan matching the description of the Mercedes traveling westbound on 1-8. BPA Chrisley observed the

Mercedes exit I-8 at Brocks Research Road. BPA Chrisley observed the Mercedes travel south on the overpass and merge onto the I-8 eastbound lanes. The Mercedes traveled eastbound on 1-8 for approximately seven and a half miles. BPA Chrisley relayed this information to other ASU members in the field.

15.     At approximately 4:39 p.m., BPA Palmer observed the Mercedes traveling eastbound on I-8 from Gordons Well overpass. BP A Palmer relayed this information over service radio. Agent Schwaderer, who was west of the location of the suspected illegal aliens, observed the Mercedes traveling eastbound on I-8. Shortly after, BPA Bautista advised ASU members that the suspected illegal aliens ran to 1-8. BPA Bautista advised ASU members one suspected illegal alien sprint to I-8, while the other suspected illegal alien walked to 1-8.

16.     Simultaneously, BP A Baustista observed the Mercedes stop on the southern shoulder of1-8 approximately 100 feet east of the suspected illegal alien. BPA Baustista observed the passenger front door of the Mercedes come open as the Mercedes was backing up to the location of the suspected illegal alien. The suspected illegal alien ran to the Mercedes and boarded the front passenger seat. The other suspected illegal alien was still walking north toward the Mercedes from Frontage Road. The Mercedes immediately merged onto I-8 and began to travel eastbound. The other suspected illegal alien went back toward the frontage road and hid himself in large brush south I-8. BPA Bautista relayed this information over the service radio.

17.     Supervisory Border Patrol Agent (SBPA) Schwaderer, who was positioned closer to the location of the suspected illegal aliens, immediately merged onto I-8, and began searching for the Mercedes. SBP A Schwaderer was able to find the Mercedes as it was traveling eastbound approaching Grey's Well Overpass. SBP A Schwaderer relayed this information over the service radio. Agents Schwaderer and Palmer activated their service vehicle's emergency lights and siren to signal for the Mercedes to stop west of the A-7 Bridges. The Mercedes slowly merged to the shoulder and came to an abrupt stop.

6

18.     BPA Palmer approached the driver side of the Mercedes and identified himself as United States Border Patrol Agent to the occupants of the Mercedes. Due to the closeness of oncoming traffic, BP A Palmer removed the Driver of the Mercedes, later identified as ROJAS, and secured him in the back of his service vehicle. SBPA Schwaderer was directing traffic away from the vehicle stop near the rear of the Mercedes. BP A Palmer went back to the passenger side of the Mercedes and encountered a male juvenile, later identified as J.E.A. BPA Palmer placed handcuffs on J.E.A. and secured him in the back of his service vehicle.

19.     BPA Durazo observed the suspected illegal alien, later identified as Francisco SOLIS-Vazquez (SOLIS), attempting to conceal himself with a shirt in the back passenger area of the Mercedes. BP A Durazo ordered SOLIS to exit the Mercedes, which he did. BPA Chrisley questioned SOLIS regarding his citizenship and was able to determine that he is a Mexican Citizen illegally present in the United States. ROJAS and SOLIS were placed under arrest. SOLIS admitted he made the illegal entry by climbing the border fence or by walking through the desert.

20.     At approximately 4:46 p.m., BPA Nunez-Gongora, who was assigned to patrol the Border in Zone 20, responded to the suspected illegal alien that was left behind south of 1-8. BPA Nunez-Gongora encountered Jose IXTLAHUACA-Conde (IXTLAHUACA) attempting to conceal himself in bushes south of I-8. BPA Nunez-Gongora placed IXTLAHUACA under arrest. BPA Nunez-Gongora questioned IXTLAHUACA regarding his citizenship and was able to determine that he is a Mexican Citizen illegally present in the United States. ROJAS, SOLIS and IXTLAHUACA were transported to the Calexico Border Patrol Station for processing.

21.     Material Witness IXTLAHUACA stated he is a citizen of Mexico. IXTLAHUACA stated he left Mexico, with the intent to illegally cross into the United States and his destination was Orange County, California. IXTLAHUACA stated, that he made arrangements when he arrived at Mexicali to be smuggled into the United States illegally for $10,000.00 U.S Dollars.

22.     Material Witness SOLIS stated he left Mexico with the intent to illegally cross into the United States and his destination was Santa Maria, California. SOLIS stated he made arrangements when he arrived at Mexicali to be smuggled into the United States illegally for $8,000.00 U.S Dollars.

23.     During a search incident to arrest of ROJAS and the Material Witnesses, three cellphones were found: a dark blue Apple iPhone (Target Device #1) was located by Agent Schwaderer and ROJAS claimed ownership. A black Apple iPhone (Target Device #2) was located by Agent Schwaderer and IXTLAHUACA claimed ownership. A light blue Vivo cellphone (Target Device #3) was found by Agent Schwaderer and SOLIS claimed ownership.  All cellphones were seized as evidence.

24.     I am aware that smuggling conspiracies require planning to successfully evade detection by law enforcement.  In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event.  Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine their whereabouts.  Given this, I respectfully request permission to search the Target Devices for data beginning on April 11, 2024, up to and including May 11, 2024, the day after the arrest of ROJAS and the Material Witnesses.

**METHODOLOGY**

25.     It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature, and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants, and have functions such as calendars and full address books, and can be minicomputers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a

secure environment or, if possible, started in "flight mode," which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and, instead, store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26.    Following the issuance of this warrant, a case agent familiar with the investigation will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephones, and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

27.    Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this Court.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

## CONCLUSION

28.     Based on all the facts and circumstances described above, I believe that probable cause exists to conclude that ROJAS and the Material Witnesses used the Target Devices to facilitate the offense of alien smuggling. The Target Devices likely were used to facilitate the offense by transmitting and storing data, specifically that described in Attachment B, which constitutes evidence of violations of Title 8, United States Code, Section 1324. I also believe that probable cause exists to believe that evidence of illegal activity committed by ROJAS, the Material Witnesses, and others continues to exist on the Target Devices. Therefore, I respectfully request that the Court issue this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Fernando Quiroz Border Patrol Agent
United States Border Patrol

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 20th day of May, 2024.

_____  12:55 p.m.
HON. LUPE RODRIGUEZ, JR.
UNITED STATES MAGISTRATE JUDGE

10

## ATTACHMENT A-1
### PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-1:**            Dark Blue Apple iPhone
Model: Unknown
Seized as FP& F: 2024255400014301 Item: 002
Seized from Mark Anthony ROJAS-Alvarez
**(Target Device #1)**



The **Target Devices** are currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## <u>ATTACHMENT A-2</u>
PROPERTY TO BE SEARCHED

The following property is to be searched:

<u>**A-2**</u>:      Black Apple iPhone
         Model: Unknown
         Seized as FP& F: 2024255400014301 Item: 005
         Seized from Jose IXTLAHUACA-Conde
         **(Target Device #2)**



The **Target Devices** are currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT A-3
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-3:**  Light Blue VIVO Cellphone
Model: Unknown
Seized as FP& F: 2024255400014301 Item: 007
Seized from Francisco SOLIS-Vasquez
**(Target Device #3)**



The **Target Devices** are currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the mobile telephones described in Attachments A-1 to A-3 include the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of April 11, 2024, up to and including May 11, 2024, and is limited to the following:

a.   tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b.   tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, and/or phone numbers that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d.   tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e.   tending to identify the user of, or persons with control over or access to, the Target Device;

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of 8 U.S.C. § 1324.